# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Auto-Mark, Inc., *d/b/a Sea Foam Sales Company*, | File No. 24-CV-04442 (JMB/EMB) |
| Plaintiff, | |
| v. | **ORDER** |
| Consumer Product Safety Commission, | |
| Defendant. | |

Alethea M. Huyser and Nathan Rice, Fredrikson & Byron, P.A., Minneapolis, MN; and Elisabeth S. Theodore (*pro hac vice*), Brian Williams (*pro hac vice*), and Orion DE Nevers (*pro hac vice*), Arnold & Porter Kay Scholer LLP, Washington, D.C., for Plaintiff Auto-Mark, Inc.

Isaac Belfer (*pro hac vice*), Department of Justice – Civil Division, Consumer Protection Branch, Washington, D.C., for Defendant Consumer Product Safety Commission.

This matter is before the Court on Plaintiff Auto-Mark, Inc. d/b/a Sea Foam Sales Company's (Sea Foam) and Defendant Consumer Product Safety Commission's (Commission) cross-motions for summary judgment.  (Doc. Nos. 32, 38.)  In this action, Sea Foam, a manufacturer of fuel additives, seeks declaratory and injunctive relief under the Administrative Procedures Act (APA) from a consumer product safety rule promulgated by the Commission, which purports to regulate the containers in which fuel-additive products are sold to consumers.  For the reasons explained below, the Court grants Sea Foam's motion and denies the Commission's motion.

1

## STATEMENT OF UNDISPUTED FACTS

Sea Foam is a Minnesota company that was founded in 1942. (Doc. No. 35 [hereinafter, "Wagner Decl."] ¶ 2.) Since its founding, Sea Foam has manufactured fuel additive and lubricant products, which consumers use in gas and diesel fuel systems. (*Id.* ¶¶ 3–6.) The Commission is an executive agency of the United States, which was created in 1972 by the Consumer Product Safety Act to "protect the public against unreasonable risks of injury associated with consumer products." *See* 15 U.S.C. §§ 2051(b)(1), 2053(a).

### A. Sea Foam Manufactures Fuel-Additive Products

Sea Foam's fuel-additive products are meant to improve the efficiency and longevity of engines and reduce vehicle emissions. (Wagner Decl. ¶¶ 3–6.) Sea Foam does not market its fuel-additive products as fuels, they are not used to produce heat or power, and they cannot be used as substitutes for engine fuels such as gasoline or diesel. (*Id.* ¶¶ 7, 9.) Instead, Sea Foam's fuel-additive products are regarded by the Environmental Protection Agency (EPA) as compounds that "enhance the quality and efficiency of fuels." EPA, *Registered Gasoline Additives*, (Apr. 28, 2025), https://www.epa.gov/gasoline-standards/registered-gasoline-additives; *see also* EPA, *Alphabetical List of Registered Gasoline and Diesel Additives* (May 2, 2025), https://www3.epa.gov/otaq/fuels1/ffars/web-addt.htm (listing Sea Foam's fuel-additive products). (*See also* Wagner Decl. Exs. A, B.)

Sea Foam's flagship fuel-additive product is Sea Foam Motor Treatment. (*Id.* ¶ 4.) Since 1942, Sea Foam has sold hundreds of millions of cans of this product worldwide. (*Id.* ¶¶ 4, 8, 22.) The product is poured into fuel tanks or oil reservoirs of internal-

combustion engines (like those in cars, motorcycles, or snowblowers) to "clean residues and deposits and to improve engine performance." (*Id.* ¶ 4.) It can also be poured into containers that store gasoline to "stabilize fuel for long-term storage." (*Id.* ¶ 4.)

### B.    The Portable Fuel Container Safety Act

In 2020, Congress passed the Portable Fuel Container Safety Act of 2020 (Act) to set certain standards to "protect against portable fuel container explosions near open flames or other ignition sources." 15 U.S.C. § 2056d. The Act was aimed at "protect[ing] the public against flame jetting from a portable fuel container"[1] which can be achieved by adding "flame mitigation devices"[2] to fuel containers. *Id.* § 2056d(b)(1), (6). Flame jetting occurs when gas vapor that extrudes from a fuel container encounters a flame or a spark, and the resulting flame from the ignited vapor propagates back into the container, where the fuel inside ignites and causes an explosion. H.R. Rep. No. 116-207, at 3 (2019). The legislative history of the Act shows a concern about "at least 11 deaths and 1,200 emergency room visits specifically involving gas can explosions during the pouring of gasoline between 1998 and 2013." *Id.* at 4. The Act directed the Commission to "promulgate a final rule to require flame mitigation devices in portable fuel containers that impede the propagation of

---

[1] The Act defined a "portable fuel container" as "any container or vessel" that holds five or less gallons, including all of the container's mechanisms for opening, closing, or pouring, that is intended for use or may be used by consumers for "flammable liquid fuels with a flash point of less than 140 degrees Fahrenheit, including gasoline, kerosene, diesel, ethanol, methanol, denatured alcohol, or biofuels." 15 U.S.C. § 2056(b)(8).

[2] A "flame mitigation device" is a device that "allow[s] fuel to pass through but prevents flames from entering the container," thereby "preventing flashback explosions." H.R. Rep. No. 116-207, at 4.

3

flame into the container," and further authorized it to conduct future rulemaking as "reasonably necessary to protect the public against flame jetting." 15 U.S.C. § 2056d(b)(1), (6).

Before the Act, and since 2013, the Commission had asked for the fuel industry's voluntary integration of flame-mitigation devices into their product's containers. H.R. Rep. 116-207, at 4. The voluntary standard adopted by the industry was one developed by ASTM International (ASTM).[3] *Id.* The Act was meant to "make sure there is a mandatory standard" shared between those already complying with the voluntary standards and those who had not yet adopted them. *Id.* The Act provided that section 553 of the APA's requirement to make a final rule did *not* apply if the Commission determined that the existing, voluntary, ASTM-developed standard met the Act's requirements and the Commission opted to adopt that standard upon determination that it meets the intent of the Act. 15 U.S.C. § 2056d(b)(3).

By May 2022, the Commission's staff issued a staff memo (Staff Memo) regarding its consideration of a suitable mandatory rule for flame-mitigation devices. (Doc. No. 1-2.). In it, staff did not make any reference to fuel additives or the containers in which fuel additives were sold; instead, it focused on the dangers and mitigation of flame jetting from fuel containers. (*See generally id*) The Staff Memo provides "[s]ome examples of

---

[3] ASTM International (formerly known as the American Society for Testing and Materials) is "a nonprofit organization in which producers, users, consumers, and representatives of government and academia develop voluntary consensus standards for materials, products, systems, and services." *See* Nat'l Library of Med., *American Society for Testing and Materials*, https://www.ncbi.nlm.nih.gov/books/NBK218333/ (last visited June 18, 2025).

portable fuel containers [as] includ[ing] portable gasoline containers (*i.e.*, gas cans), and containers for cigarette lighter fluid, charcoal lighter fluid, and liquid fireplace fuel (such as firepot fuel)." (*Id.* at 4.) The Staff Memo recommended adopting the voluntary standard previously used by the fuel industry to design portable fuel containers (referred to as "ASTM F3429") as a standard that meets the Act's requirements. (*Id.* at 5, 8.) As a result, and consistent with the Act's voluntary-standard exception, 15 U.S.C. § 2056d(b)(3), the Staff Memo concluded that the Commission need not undergo the final rule-making procedure required by the APA and need only publish its determination in the Federal Register. (*Id.* at 5; *see also id.* at 4–6.) The Commission thereafter published a notice seeking public comment on the Staff Memo. 88 Fed. Reg. 2208.

Then, on January 13, 2023, the Commission published its "Determinations Regarding Portable Fuel Container Voluntary Standards Under the Portable Fuel Container Safety Act" (Determination). 88 Fed. Reg. 2206. In Section III of the Determination, the Commission published, among other things, the six comments it received during the notice and comment period. A diesel fuel-additive manufacturer (which took the position that additives are not "fuel") asked whether "additives" would be considered "fuel" and separately requested clarification on the definition of "liquid fuels." *Id.* at 2209. The Commission's response was as follows:

> The [Act] defines "portable fuel containers" as products "intended for flammable liquid fuels with a flash point less than 140 degrees Fahrenheit, including gasoline, kerosene, diesel, ethanol, methanol, denatured alcohol, or biofuels. Fuels generally are considered substances that can be burned to release energy, and liquids with a flash point below 140 degrees Fahrenheit are, by the definition of flash point, capable

> of being burned at that temperature. Staff assessed all known flammable liquids less than 140 degrees as part of the evaluation of the voluntary standards under the [Act]. Accordingly, while classification of a particular container for purposes of the [Act] *is case-specific*, as a general matter, *when a liquid with a flash point less than 140 degrees Fahrenheit is intended to be used as, or in, a fuel mixture to support combustion, it is a fuel* under the definition of "portable fuel containers" as indicated in the [Act].

*Id.* (internal citation omitted) (emphasis added).

Then, in Section IV of the Determination, "[b]ased on [the Commission's] staff's assessment and recommendations regarding the . . . voluntary standards, and consideration of the comments submitted," the Commission formally adopted the recommendation in the Staff Memo that ASTM F3429 would become the standard to govern flame-mitigation devices for pre-filled portable fuel containers under the Act. *Id.* at 2209. The adoption of ASTM F3429 was treated as a consumer product safety rule under the Consumer Product Safety Act and would take effect on July 12, 2023. *Id.* at 2210.

### C. Sea Foam's Inquiry Regarding Applicability to Fuel-Additive Products

Meanwhile, Sea Foam reviewed the Act and determined that it would not apply to its fuel-additive products. (Wagner Decl. ¶ 9.) Sea Foam reasoned that the Act is expressly limited to "portable fuel containers," which are defined only as those "intended for flammable liquid fuels," of which Sea Foam's products are not. (*Id.* (quoting 15 U.S.C. § 2056d(b)(8).) Further, Sea Foam was unaware of any flame-jetting incidents involving its products in its eighty-five-year history; in its view, its products were not implicated in the consumer-safety concerns underlying the Act. (*Id.* ¶¶ 20–22.)

Later, Sea Foam became aware that the Commission issued a determination that adopted certain standards for flame-mitigation devices for portable fuel containers. (*Id.* ¶ 11.) In essence, the Commission had adopted standards developed by ASTM and that had previously been voluntarily applied in the fuel industry and had declined to expressly say whether those standards applied to pre-filled containers for fuel-additive products. (*Id.*)

On May 15, 2023, Sea Foam wrote to the Commission about confusion in the fuel-additive industry about whether the final rule applied to fuel-additive containers. (Doc. No. 1–3.) In the letter, Sea Foam explained that it had determined that the Act was not applicable to its fuel-additive products and that the fuel-additive industry could not possibly comply with the new rule by the July 2023 enforcement deadline. (*Id.*) Sea Foam requested that the Commission clarify whether the final rule applied to fuel-additive containers and, if it does, to exercise its enforcement discretion because, in Sea Foam's view, the Determination did not adopt the ASTM definition of "liquid fuel," and instead created its own broader definition that purports to include fuel additives. (*Id.* at 3–4.)

On May 19, 2023, the Commission (via its Director of Compliance and Field Operations (Compliance Office)[4]) issued a public response (May 2023 Letter). Consumer Prod. Safety Comm'n, *Enforcement Discretion for Pre-Filled Portable Fuel Containers Subject to ASTM F3429/F3429M-20 Under the Portable Fuel Container Safety Act of 2020*

---

[4] The Commission comprises up to five Commissioners who are appointed by the President and confirmed by the Senate. 15 U.S.C. § 2053(a). Its staff includes the Compliance Office, which aids in investigatory and enforcement matters and provides guidance to industry on complying with product safety rules. 16 C.F.R. § 100.21.

(May 19, 2023) (hereinafter, "May 2023 Letter").  In response, the Commission stated that the rule covered "products including, but not limited to, gasoline kerosene, diesel, ethanol, methanol, denatured alcohol, [and] bio fuels," all of which were expressly covered by statute, but added that it also applied to "camp fuel, fire starters and accelerants, *fuel additives, and engine cleaners*."  *Id.* at 1 (emphasis added).   The Commission wrote that the additional substances were brought into the scope of the Act because the Commission had learned through stakeholders that things like "camping fuels" are "used as alternative heating and lighting fuel in emergency situations such as hurricanes and blizzards."  The Commission further reasoned that "consumers may resort to using alternative fuels for unintended purposes subjecting them to potential fire and burn hazards."  *Id.* at 1–2.  It did not, however, provide any specific reason why fuel additives and engine cleaners had been added to the list of covered liquids.  *See id.*  The Commission also stated that it would exercise its enforcement discretion through July 12, 2024, and that manufacturers who had asked for enforcement discretion (such as Sea Foam) would be required to provide the Commission with quarterly updates on their progress toward compliance.  (*Id.*)

On May 30, 2024, Sea Foam wrote again to the Commission.  (Wagner Decl. ¶ 14; Doc. No. 1–5.)  In this second letter, Sea Foam asked the Commission to remove fuel additives from the scope of the final rule because, among other reasons, (1) existing regulatory frameworks recognize a distinction between fuels and fuel additives; and (2) there is no evidence that Sea Foam's products are used by consumers in such a way as to cause concern about flame-jetting (i.e., there had been "zero known flame-jetting or container rupturing "incidents in over 80 years").  (*Id.* at 4–5.)  Sea Foam also asked, in

8

the alternative, to further extend the enforcement date of the new standards because, despite its diligent efforts,[5] Sea Foam was concerned that it would be unable to comply with the new standards by the fast-approaching enforcement date. (*Id.* at 1–4.) Sea Foam explained that, to its knowledge, flame-mitigation devices needed to be certified, and there was just one such testing facility in the entire country. (*Id.*) Sea Foam also explained that the flame-mitigation devices it had been piloting were prohibitively impractical for its product's consumers. (*Id.* at 3.)

On July 3, 2024, the Commission (via the Director of the Compliance Office on Commission letterhead) responded (July 2024 Letter). (Doc. No. 1-1.) The Commission advised that the Act's enforcement deadline would be extended by another year, to July 12, 2025.[6] (*Id.*) The Commission acknowledged Sea Foam's concerns that fuel-additive

---

[5] After the May 2023 Letter, Sea Foam undertook efforts to make its products' containers compliant with the Act (i.e., to add flame-mitigation devices to the containers). (Wagner Decl. ¶ 25.) Initially, Sea Foam identified a container-closure manufacturer that could provide compliant closure devices at the volumes necessary for Sea Foam's product demand, but the closures would increase the cost of containers by 300%. (*Id.* ¶¶ 25, 28, 31.) Sea Foam would also incur increased production costs occasioned by having to retool and manufacture the new containers to feature the updated closures, to the tune of approximately $25 million in the next decade. (*Id.* ¶ 29.) Ultimately, the vendor determined it would be unable to manufacture the closures in 2025 and Sea Foam had to explore other options. (*Id.* ¶¶ 25, 26, 30.) However, the other potentially viable options would increase costs to Sea Foam even further and would result in containers that take a long time to empty, which would impact customer goodwill. (*Id.* ¶¶ 31–33, 36–38.) Sea Foam had also explored reformulating its flagship product to bring its flash point above 140 degrees Fahrenheit (i.e., out of the scope of the rule). (*Id.* ¶ 40.) However, the reformulation efforts had been expensive and resulted in a product that was less versatile and efficient. (*Id.* ¶¶ 35–39, 41.)

[6] After filing suit, the Commission and Sea Foam entered into a stipulation by which the Commission would extend its enforcement discretion as to Sea Foam until January 12,

manufacturers were grappling with how to redesign their packaging so as to comply with the Act's requirements without significant detriment to customer goodwill. (*Id.*) The Commission further asked that industry actors keep the Commission apprised on a quarterly basis on their progress toward compliance."[7] (*Id.* at 2.) The Commission also advised that failure to comply "could subject a firm to civil or criminal penalties." (*Id.*)

### D.    This Action

In December 2024, Sea Foam filed its four-count Complaint, seeking declaratory and injunctive relief for the alleged breaches of the APA, including that the Commission acted in excess of statutory authority in violation of 5 U.S.C. §§ 706(2)(A), (C) by purporting to regulate containers for non-fuel liquids (Count I); the Commission engaged in arbitrary and capricious rulemaking in violation of 5 U.S.C. § 706(2)(A) (Count II); and the Commission failed to observe the APA's notice and comment procedure in violation of 5 U.S.C. § 706(2)(D) (Count III). Sea Foam also alleged that the Commission violated its due process rights by promulgating an unconstitutionally vague rule (Count IV).

### DISCUSSION

Sea Foam and the Commission have brought early cross-motions for complete summary judgment.[8] Summary judgment is warranted "if the movant shows that there is

---

2026, or six months after the Court issues its order on the cross motions for summary judgment. (Wagner Decl. ¶ 17.)

[7] Sea Foam has complied with this requirement, both before and after commencing this litigation. (Wagner Decl. ¶ 19.)

[8] Discovery has not yet begun and the parties seek summary judgment in their favor on the administrative record alone.

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Of course, a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To survive the motion, the non-moving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). As is normally the case in a summary judgment motion, including in cross-motions, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. For the reasons discussed below, the Court grants Sea Foam's motion and denies the Commission's motion.

## I. SUBJECT-MATTER JURISDICTION

Before the Court reaches the merits of the parties' arguments on Sea Foam's APA claims, it must first address two threshold issues raised by the Commission: (1) that Sea Foam's suit is time-barred and was brought in an improper venue pursuant to 15 U.S.C. § 2060(a); and (2) that Sea Foam's APA claims do not implicate any final agency action. The Court disagrees with the Commission and concludes it has subject-matter jurisdiction over the claims in this lawsuit.

### A. Timeliness and Venue Under 15 U.S.C. § 2060(a)

The Commission first argues that the Court lacks subject-matter jurisdiction over Sea Foam's claims because Sea Foam did not comply with the strictures of 15 U.S.C.

§ 2060(a) when bringing this lawsuit.  (Doc. No. 40 at 20–32.)  That statute provides for direct appellate review of Commission rulemaking activity, as follows:

> Not later than 60 days after a consumer product safety rule is promulgated by the Commission, any person adversely affected by such rule, or any consumer or consumer organization, may file a petition with the United States court of appeals for the District of Columbia, or for the circuit in which such person, consumer, or organization resides or has his principal place of business for judicial review of such rule.

15 U.S.C. § 2060(a).  The Commission asserts that, given the terms of section 2060(a), this lawsuit is misplaced for two reasons: (1) it was brought in the district court, as opposed to the Eighth Circuit or D.C. Circuit; and (2) it was brought well after sixty days from the Commission's promulgation of the challenged consumer product safety rule (which rule it identifies as comprising only Section IV of the Determination (i.e., not including staff responses to comments).  Sea Foam disagrees, arguing that section 2060(a) expressly does not purport to set forth the *exclusive* means for judicial review of Commission action but instead provides a non-mandatory avenue for direct appellate court review.

The Court first concludes that section 2060(a) does not vest exclusive jurisdiction over the claims at issue in the Eighth or D.C. Circuit Courts of Appeals.  While the Commission is generally correct that the Supreme Court has expressed "a preference for direct appellate review of agency action pursuant to the APA," *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 861 (8th Cir. 2013), and courts will "not presume that Congress intended to depart from the sound policy of placing initial APA review in the courts of appeals," *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 745 (1985), there is a well-recognized exception to this general rule: federal district courts may exercise subject-

matter jurisdiction of such claims if Congress gives a "firm indication" that initial APA review can or should occur elsewhere." *Id.* at 745. Here, Congress gave such a "firm indication" in section 2060(a). For instance, section 2060(a)'s savings clause expressly instructs that "[t]he remedies provided for in this section shall be *in addition to* and *not in lieu of* any other remedies provided by law." 15 U.S.C. § 2060(e) (emphasis added). That is, section 2060(a) provides only a non-mandatory option for direct appellate review that is not in lieu of remedies such as those provided by the APA.[9]

In addition, the plain text of section 2060(a) itself is non-mandatory. It provides that an aggrieved party "may" file a petition for direct appellate review within 60 days of promulgation of the rule; the use of "may" instead or mandatory terms like "shall" or "must" provides sufficient indication that Congress contemplated initial APA review in federal district courts. *See id.* § 2060(a).

Other courts have reached this same conclusion, and the Court is persuaded by the analysis underlying these decisions. *See Dow Chem., U.S.A. v. Consumer Product Safety Comm'n*, 459 F. Supp. 378, 389 n.10 (W.D. La. 1978) (observing that 15 U.S.C. § 2060(a) does not bar APA review by district courts); *Kaiser Aluminum & Chem. Corp. v. U.S. Consumer Product Safety Comm'n*, 414 F. Supp. 1047, 1057 (D. Del. 1976) (determining

---

[9] Section 2060(a) is different from other statutes providing for direct appellate review under the APA. For example, in *Iowa League of Cities*, the Eighth Circuit determined that the EPA's direct-appellate-review statute—33 U.S.C. § 1369—was exclusive as to the aggrieved party's specific challenge. 711 F.3d 844. The Court determined it was because Congress did not include any firm indication that other routes of judicial review were available (e.g., with a savings clause such as that found in 2060(e)).

that the federal district court had jurisdiction over a challenge to the Commission's rule because "[t]here is no evidence in the statute that the court of appeals' review was meant to be exclusive" and acknowledging the savings clause).

Thus, the suit is neither time-barred[10] nor brought in an improper venue, and this Court may exercise subject-matter jurisdiction over it.

### B.    Final Agency Action

Next, the Commission argues that the Court lacks jurisdiction to entertain Sea Foam's APA claims because Sea Foam does not challenge any final agency action. The final-agency-action requirement is a jurisdictional element of an APA claim. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). An "agency action" is defined by statute as a non-exhaustive list of agency functions, "include[ing] the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 15 U.S.C. § 551(13). Under *Bennett v. Spear*, 520 U.S. 154 (1997), two hallmarks, together, determine whether an agency action is final. In the first *Bennett* prong, courts consider whether the action "mark[s] the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *Id.* at 177–78. This prong asks "whether an action is properly attributable to the agency itself and represents the culmination of that agency's consideration of an issue, or is, instead, only the ruling of a subordinate official, or tentative." *POET Biorefining, LLC v. E.P.A.*, 970 F.3d 392, 404

---

[10] The Commission does not make the argument that, if section 2060(a) does not apply, then the underlying APA claim would be untimely. The APA has a six-year statute of limitations. 28 U.S.C. § 2401.

(D.C. Cir. 2020) (quotation omitted). The second *Bennett* prong requires that the agency action "be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78; *see also* 5 U.S.C. § 704 (setting forth which agency actions are reviewable).

The Commission urges that neither the Determination, nor the May 2023 and July 2024 Letters (together, the Letters) are final agency actions. As discussed below, the Court concludes that the Determination (which includes the definition of "fuel" set forth in Section III) is a final agency action, but the Letters are not.

*1.    Sections III and IV of the Determination*

Sea Foam asserts that the definition of "fuel" set forth in Section III of the Determination is a final agency action subject to judicial review. In Section III, the Commission purported to define liquid fuels, the containers for which were regulated by the rule, as any "liquid with a flash point less than 140 degrees Fahrenheit *intended to be used as, or in, a fuel mixture to support combustion*, it is a fuel." 88 Fed. Reg. at 2209 (emphasis added). However, the Commission takes the position that only Section IV of the Determination (i.e., the formal pronouncement of the rule that does not purport to define "fuel"), could constitute a final agency action. It argues that the comments and responses set forth in Section III merely comprise non-binding staff responses to public comments. Sea Foam counters that the staff comments that precede Section IV are included in the Determination and are therefore reviewable.

Sea Foam is correct. The language of Section IV indicates that Section III is not merely a record of staff responses; it is also a record that the agency considered these

comments in its decision-making. Section IV begins by acknowledging that the Commission made its determinations "[b]ased on [Commission] staff's assessment and recommendations regarding the three voluntary standards *and consideration of the comments submitted*." 88 Fed. Reg. at 2209 & n.3 (emphasis added). Further, under *Bennett*, the Determination marked the consummation of the agency's decisionmaking process until that point, *see Home Box Office, Inc. v. F.C.C.*, 567 F.2d 9, 54 (D.C. Cir. 1977) (advising full administrative record includes what was before the agency official at the time of decision), and the action was one from which clear legal consequences flowed. Indeed, the Commission ultimately seeks to enforce a definition of "fuel" that includes liquids "intended to be used as, or in, a fuel mixture to support combustion." Therefore, the Court regards the definition of "fuels" Section III as a final agency action, incorporated into Section IV.

### 2. *The Letters*

The Commission also argues that the Letters were not agency actions, much less final agency actions, because they pronounced no "rule," they were meant only to provide a *nonbinding* staff interpretation of the rule, and they were issued by the Commission's Office of Compliance and Field Operations (an office that lacks authority to promulgate rules on behalf of the agency). The May 2023 Letter provided that the Compliance Office would enforce the rule as applying to products such as "gasoline, kerosene, diesel . . . fuel additives, and engine cleaners," and that failure to comply with the Act's requirements could result in criminal and civil penalties. Later, in the July 2024 Letter, the Compliance Office wrote that it declined Sea Foam's request to remove "fuel additives" from the scope

of its enforcement purview and advised that failure to comply with the rule's requirements could result in criminal and civil penalties.

The Commission relies on the analysis in *Jake's Fireworks Inc. v. U.S. Consumer Product Safety Commission*, 105 F.4th 627 (4th Cir. 2024), *cert. denied* __ S. Ct. __, 2025 WL 1426674 (2025). In *Jake's Fireworks*, the Commission's Compliance Office sent the plaintiff several notices warning that the plaintiff's products were unreasonably dangerous and amounted to a banned substance under the Commission's regulations and that, if the plaintiff continued to sell them, plaintiff could face criminal and civil liability. *Id.* at 629–30. The plaintiff brought APA challenges to the determination that its products were banned. *Id.* at 630–31. On appeal to the Fourth Circuit, the sole issue was whether the notices from the Compliance Office could be considered "final agency actions." *Id.* at 631. The Fourth Circuit determined that the notices were not final agency actions for several reasons: (1) they did not meet the "consummation" requirement of the first *Bennett* prong because, under the Commission's own governing statutes and regulations, the Compliance Office is a subordinate body of the Commission that cannot make final decisions; (2) according to a Handbook (which outlined the agency's decision-making process and "which was attached to the Notice," *Jake's Fireworks Inc. v. U.S. Consumer Prod. Safety Comm'n*, 498 F. Supp. 3d 792, 803 (D. Md. 2020), the plaintiff could have requested a hearing on the substance of the notices to bring the agency's position into a finality; and (3) the regulation that establishes the Compliance Office does not show any delegation of rulemaking authority to it. *Id.* at 631–32. The Fourth Circuit concluded by observing that

the plaintiff's position "would turn the agency's decisionmaking hierarchy upside down." *Id.* at 633.

For its part, Sea Foam argues that *Jake's Fireworks* is distinguishable and urges the Court to conclude that the letters constitute final agency actions under *Bennett* because they were written in response to Sea Foam's correspondence notifying the Commission that the scope of application of its rule (as pronounced in the Determination) was not clear. In the May 2023 Letter, the Commission appeared to announce for the first time, explicitly, that "fuel additives and engine cleaners" were included in the scope of the rule. In Sea Foam's view, this was the consummation of the agency's decisionmaking to date, and the letters determined Sea Foam's rights and obligations with respect to the rule.

*Jake's Fireworks* provides analogous and persuasive analysis. Like the notices in *Jake's Fireworks*, the May 2023 Letter and July 2024 Letter came from the Compliance Office. In addition, the language of the letters purports only to speak for the Compliance Office, not for the Commission as a whole. As discussed in *Jake's Fireworks*, the Compliance Office was not delegated any rulemaking authority and does not have appear to have authority to render final agency actions. For that reason, the May 2023 Letter and July 2024 Letter do not meet the first prong of *Bennett*. Sea Foam's arguments do not address these deficiencies and instead focus on how the May 2023 Letter and July 2024 Letter satisfy the second *Bennett* prong. Further, Sea Foam directs the Court to no other case that applies the *Bennett* factors to determine whether correspondence from the Compliance Office comprises final agency action.

18

Thus, the Court concludes that the Determination, which defines "liquid fuels" as liquids "intended to be used as, or in, a fuel mixture to support combustion," constitutes a final agency action, and the May 2023 Letter and July 2024 Letter do not.[11]

## II.    LIMITS OF THE COMMISSION'S STATUTORY AUTHORITY

Sea Foam first argues that it is entitled to summary judgment in its favor on Count I because the Commission exceeded its authority by defining "fuel" in the Determination as including any liquids with a flash point below 140 degrees that was "intended to be used as, or in, a fuel mixture to support combustion."  88 Fed. Reg. at 2209.  Specifically, Sea Foam argues that, because the Act is the sole authority on which the Commission had to rely when creating a rule to govern the addition of flame-mitigation devices to "portable fuel containers," the Commission exceeded the authority given to it by Congress when it issued a rule that governs the packaging of non-fuel liquids.  (Doc. No. 34 at 20–32.)

When determining whether an agency exceeded its authority, courts "start with the statutory text."  *Garland v. Cargill*, 602 U.S. 406, 415 (2024).  The Eighth Circuit has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Argus Leader Media v. U.S. Dep't of Agric.*, 740 F.3d 1172, 1177 (8th Cir. 2014).  Moreover, "[w]hen the words of a statute are unambiguous, then, this first cannon is also the last: judicial inquiry is complete.'"  *Id.* (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461–62 (2002)).

---

[11] The Court's conclusion that the Letters are not final agency actions moots Count III, in which Sea Foam asserted that the Commission's attempts to regulate fuel additives via the Letters constituted an improper bypassing of the notice-and-comment rulemaking process required by the Act and the APA.

Turning to the statutory text: the Act directs the Commission to issue a rule "to require flame mitigation devices in portable fuel containers." 15 U.S.C. § 2056d(b)(1). It defines a "portable fuel container" as one that is "intended for flammable liquid *fuels* with a flash point less than 140 degrees Fahrenheit, including gasoline, kerosene, diesel, ethanol, methanol, denatured alcohol, or biofuels." *Id.* § 2056d(b)(8)(A) (emphasis added). Both parties agree that, if "a statute includes an explicit definition, [courts] must follow that definition." *Iverson v. United States*, 973 F.3d 843, 847 (8th Cir. 2020). The parties also agree that, "when a word is not defined by statute, [courts] normally construe it in accord with its ordinary and natural meaning" and that a word's ordinary and natural meaning "accords with its dictionary definition." *Id.* (quotation omitted).

In this case, the Court concludes that the ordinary and natural meaning of "fuel" is necessarily narrower than the definition in Section III of the Determination for three reasons. First, on its face, the definition of "fuel" in the Determination is so broad that it includes liquids that are not themselves fuel. The reference to and importance of the phrase "fuel mixture" in the Commission's definition of fuel expands the rule beyond the authority provided by Congress, which did not use the term "fuel mixture," but instead referred only to "fuels." *See* 15 U.S.C. § 2056d(b)(1) (referencing "portable fuel containers," and not mentioning "fuel mixture" or "fuel mixture containers"); *id.* § 2056d(b)(8)(A) (referencing "flammable liquid fuels" and not mentioning "fuel mixture" or "flammable liquid fuel mixtures").[12] Because the term "fuel mixture" is not itself limited, it could include any

---

[12] To the extent that the Commission argues Sea Foam's products are fuels because they are capable of being burned at 140 degrees Fahrenheit, the Court concludes that this feature,

liquid substance that contains a fuel and at least one other liquid, including a nonfuel and including all ranges of proportions between fuel(s) and nonfuel(s). In this way, the Commission's definition in the Determination expands its authority from regulating portable fuel containers to regulating containers of nonfuel that might be intended to be used with a fuel.[13]

Second, and more importantly, the statutory authority to regulate "fuel" does not include any authority to regulate the fuel-additive products at issue in this case. The parties agree that the plain meaning of "fuel" is provided by the following dictionary definitions:

---

by itself, is not sufficient to accurately characterize the fuel-additive products at issue as "fuels." It is true that the containers for Sea Foam's fuel-additive products bear a label warning customers: "DANGER: FLAMMABLE." However, Congress did not authorize the Commission to regulate the containers of all *flammable liquids*; instead, the plain language of the statute provides the Commission with authority to make a rule to regulate containers that hold "flammable liquid *fuels*." 15 U.S.C. § 2056d(b)(8) (emphasis added).

[13] The Commission argues that "fuel mixture" is limited to liquids that are not only capable of producing heat or power by burning, but that are also used for that purpose. (Doc. No. 40, at 26). This limitation, however, undermines the Commission's ultimate conclusion that it has authority to regulate Sea Foam's fuel-additive products because, according to the factual record, fuel additives like Sea Foam's products are used in fuel mixtures to clean the components of fuel and oil systems to help engines run more efficiently; they "liquify harmful deposits in fuel passageways, stabilize fuel concentration to counteract residue buildup, and control fuel moisture to prevent engine corrosion." (Wagner Decl. ¶ 3.) Even though Sea Foam's fuel-additive products combust inside the engine to which they are added (Doc. No. 40 ¶ 36), the record presented shows that these products, by themselves, do not create energy or power and cannot be used as substitutes for the fuel to which they are added (e.g., gasoline, diesel), (Wagner Decl. ¶ 7). That is, the record shows that Sea Foam's products are not used for the purpose of combustion. If the Commission is correct that the "fuel mixture" is limited only to those liquids that are both capable of producing heat or power and also used for that purpose, then the definition in the Determination cannot cover the products at issue in this case.

- "[A] material used to produce heat or power by burning."[14] *Fuel*, Merriam-Webster.com, https://bit.ly/3ZQ3Qkj.

- "[A]ny substance burned as a source of heat or power, such as coal or petrol." *Fuel*, Collins English Dictionary (12 ed. 2014).

- "[A]ny material, as coal, oil, gas, wood, etc., burned to supply heat or power." *Fuel*, Webster's New World College Dictionary (4th ed. 2010).

- "[M]aterial such as coal, gas, or oil that is burned to produce heat or power." *Fuel*, New Oxford Am. Dictionary (3d ed. 2010).

(Doc. No. 34 at 21 (including these dictionary definitions in Sea Foam's discussion of the plain meaning of fuel); Doc. No. 40, at 25–26 (including two dictionary definitions—a "combustible matter used to maintain fire, as coal, wood, oil, or gas, in order to create heat or power" and "a material used to produce heat or power by burning"—and noting that these dictionary definitions should control the Court's determination of the plain meaning of "fuel").)  Given the record presented at this time, the fuel-additive products at issue do not meet the dictionary definitions of "fuel" because they are used to clean the components of fuel and oil systems (Wagner Decl. ¶ 3), and do not create heat or power on their own or are otherwise able to be used as substitutes for fuel, (Wagner Decl. ¶ 7).  In addition, Sea Foam correctly observes that at least one government agency defines "fuel" so as to exclude fuel-additive products from that definition.  (*See* Wagner Decl. Exs. A, B

---

[14] Sea Foam points out that other courts (addressing different issues than the issue before the Court) have referred to this exact definition of "fuel." *Green Gas Del. Statutory Tr. v. IRS*, 147 T.C. 1, 40–41 (2016) (seeking definition of "fuel"); *Maxma v. ConocoPhillips, Inc.*, No. 2:03-CV-0421, 2005 WL 1690611, at *7–8 (E.D. Tex. July 19, 2005) (determining "fuel" has distinct definition from "fuel additive" in patent suit).

(demonstrating that the EPA maintains separate registries for fuels and fuel additives and that Sea Foam has no products registered with the EPA as "fuels").)

The Court therefore concludes that the Commission's definition of "liquid fuels" in the Determination expands on the kinds of containers of liquids that Congress authorized it to regulate. Thus, the Court will grant summary judgment in Sea Foam's favor on Count I[15] and deny the Commission's motion for summary judgment in its entirety.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.     Plaintiff Auto-Mark, Inc., d/b/a Sea Foam Sales Company's motion for summary judgment (Doc. No. 32) is GRANTED.

2.     Defendant Consumer Product Safety Commission's motion for summary judgment (Doc. No. 38) is DENIED.

3.     This action is DISMISSED WITH PREJUDICE.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  September 18, 2025                    /s/ *Jeffrey M. Bryan*
                                             Judge Jeffrey M. Bryan
                                             United States District Court

---

[15] Having determined that the Commission exceeded its authority by purporting to regulate containers for Sea Foam's products, which are not fuels, Sea Foam's remaining arguments on Counts II and IV (i.e., that the Commission engaged in arbitrary and capricious rulemaking, that the Commission's definition of "fuel" in Section III of the Determination is unconstitutionally vague) are therefore moot.

23